## Case No. 11,158.

### PIERSON et al. v. LAWRENCE.

[2 Blatchf. 495.] [1]

Circuit Court, S. D. New York. Nov., 1852.

CUSTOMS DUTIES — RECOVERY BACK — SETTING FORTH IRREGULARITIES IN PROTEST — WHAT IS PURCHASE — MANUFACTURE AFTER ACCEPTANCE OF ORDER — ACT AUG. 30, 1842 — DATE OF INVOICE.

1. Where duties paid to a collector are sought to be recovered back, on the ground that the proceedings in the custom house, in initiating or conducting an appraisement of the goods on which the duties were paid, were irregular, the irregularities relied on must be set forth specifically in the protest.

[Cited in Pierson v. Maxwell, Case No. 11,159; Focke v. Lawrence, Id. 4,894; Cornett v. Lawrence, Id. 3,241; Wilson v. Lawrence, Id. 17,816.]

2. The law as settled in Thomson v. Maxwell [Case No. 13,983], in regard to what is requisite in a protest against the payment of duties, again applied.

[Cited in Muser v. Robertson, 17 Fed. 502.]

3. An accepted order for goods, although a purchase in the usage of the particular trade, as between vendor and vendee, is not a purchase under the 16th section of the act of August 30, 1842. (5 Stat. 563), so as to authorize the entry of the goods, when imported, at a dutiable value fixed at the current price of like goods at the time the order was accepted, where the goods are to be manufactured after the acceptance of the order.

4. The date of an invoice, in an entry by the purchaser of goods, is, as against such purchaser, primâ-facie evidence of the time of their purchase, and conclusive until a mistake in the date is proved.

This was an action [by Henry L. Pierson and Samuel Hopkins] to recover back an alleged excess of duties paid to the defendant [Cornelius W. Lawrence], as collector of the port of New York, on certain importations of iron. A verdict was taken for the plaintiffs, subject to the opinion of the court.

Elias H. Ely, for plaintiffs.

J. Prescott Hall, Dist. Atty., for defendant.

Before NELSON, Circuit Justice, and BETTS. District Judge.

BETTS, District Judge. This cause was decided by the court at the last term, but, at the instance of the counsel for the plaintiffs, the opinion of the court was withheld, and leave was given to the plaintiffs to apply to the court at the present term for a re-hearing, upon the suggestion that impor-

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

tant facts had been overlooked by the court, or had not been properly presented to their attention. The court consented to receive an argument on paper and to reconsider the case. The United States attorney declined offering any further argument. The counsel for the plaintiffs has presented his views in a carefully prepared statement of facts and law, and the court has reviewed, with close attention, these suggestions. The result is, that we have not been able to discover any error in our conclusions at the last term.

The case upon the facts is this: On the 7th of May, 1849, the plaintiffs made an entry, at the custom house in New-York, of 870 bundles of hoop iron, valued at £174 10s. 9d. sterling, commissions, 2½ per cent., £4 7s. 3d, and charges, £1 1s. 5d., total, £179 19s. 5d., with an affidavit of one of the plaintiffs that the invoice accompanying the entry was true. That invoice is dated March 14th, 1849, and is from the Coalbrookdale Company to the plaintiffs. The iron was imported from Liverpool to New-York in the ship St. Lawrence, and the date of the invoice, for the purposes of this case, may be taken to be the time of the departure of the ship from Liverpool, and that of the entry the time of her arrival in New-York. On the 9th of May, 1849, one of the principal appraisers wrote on the face of the invoice: "Add 10s. per ton, to make market value, with chgs. and coms. as per invoice." This raised the entry to £191 2s. 3d., upon which sum duties were exacted. On the 10th of May, 1849, the plaintiffs wrote upon the face of the entry the following protest, addressed to the defendant: "We hereby protest against the payment of 30 per cent. duty on £191 2s. 3d., charged on 870 bundles of hoop-iron contained in this entry, claiming that, under existing laws, said goods are only liable to a duty of 30 per cent. on £179 19s. 5d., because that was the actual cost of the goods, and was the full market value at the time of purchase, and, if any delay occurred in the shipment, it was contrary to our express wishes and directions and owing to circumstances entirely beyond our control. We pay the amount exacted, in order to get possession of the goods, claiming to have the difference refunded."

Another entry was made by the plaintiffs, the same day, of 346 bundles of hoop-iron and 175 bundles of bar-iron, invoiced by the Coalbrookdale Company, March 14th, 1849, imported in the ship Blanche, from Liverpool, invoiced and entered at £120 7s. 5d., and, as in the preceding case, raised by appraisement to £128 4s. 8d. On the 10th of May, 1849, a protest, in the same terms as in that case, was written by the plaintiffs on the entry. The oath of the owner and the order of the appraiser were the same in this instance as in the preceding one.

On the same day, a third entry was made, in like manner, by the plaintiffs, of 974 bars

and 40 bundles of iron, imported in the ship E. E. Perkins, from Liverpool, invoiced by the Coalbrookdale Company, March 16th, 1849, at £198 5s. 2d. As in the preceding cases, the invoice valuation was raised by appraisement to £226 15s. 8d. The duties imposed thereon were paid by the plaintiffs under a written protest, dated May 10th, 1849, in the same terms as the one before set forth.

On the 21st of May, 1849, three other entries were made by the plaintiffs. One was of 839 bundles of bar-iron, imported in the ship N. H. Wolfe, invoiced March 27th, 1849, by the same company, at £200 7s. 8d., and raised by appraisement to £233 7s. 6d. The second was of 3,449 bars and 20 bundles of iron, imported in the ship Liberty, invoiced April 19th, 1849, at £277 7s. 3d., and appraised at £329 12s. 0d. The third entry was on two invoices from the same company, one dated April 6th, 1849, the other dated April 12th, 1849, imported in the ship Garrick. The joint invoice value was £786 5s. 4d. The appraised value was £866 6s. 9d. Duties were imposed and paid on the appraised values in all the cases, and like written protests were made by the plaintiffs.

On the trial, the plaintiffs proved the purchase-price or actual cost of the iron, by giving in evidence a correspondence between themselves and the Coalbrookdale Company, of Liverpool, by which it appeared that the iron charged in the invoices was ordered by the plaintiffs, by letters dated in New-York in the months of November and December, 1848, and January, 1849, with specifications of the description and quality of the iron required. When those orders were received in Liverpool, the Coalbrookdale Company booked them, charging the various kinds of iron specified at the then current prices, and advised the plaintiffs that the orders were accepted. It was proved that this constituted a purchase, in the usage of the trade. The vendors then proceeded to prepare the iron conformably to the orders, and, when it was shipped, the invoices were made out at the prices prevailing at the time the orders were received, and without regard to the price or market value when the iron was delivered or shipped. Ordinarily, on the purchase of iron from manufacturers, some time elapses after the iron ordered is booked, before it can be rolled and prepared for shipping. Manufacturers are not accustomed to keep large stocks on hand awaiting orders, but to manufacture it to conform to the description ordered. The iron in the present case was ordered previously to the period it was expected to be shipped, to give time to have it manufactured. It is to be assumed that the appraisement made by the appraisers exhibits the true market value of the iron at the times it was invoiced and shipped, for there is no evidence contradicting that valuation.

The plaintiffs protested against the duties exacted on the valuations of the appraisers, claiming that the iron was subject to duty only on the invoice prices, because these represented the actual cost and full market value at the time of purchase. They now insist that the evidence produced by them on the trial proves that the market value and purchase-prices of the iron were according to the charges on the invoices and entries; and, further, that they have now made it evident, that the action of the appraisers and collector, in valuing the iron and imposing the additional duties, were irregular and without authority of law.

In support of the latter branch of this proposition, the counsel for the plaintiffs has gone into a minute and labored analysis of the provisions of the revenue laws in relation to the entry and appraisement of goods, and assumes, in maintenance of the first branch, as a principle of law, that, under the correspondence between the plaintiffs and the Coalbrookdale Company, there was a purchase of the iron by the plaintiffs at the time their orders were booked by the company at Liverpool.

This latter position was the one most considered by the court on the former argument, and we disposed of it adversely to the claim of the plaintiffs. We supposed that the reargument was intended chiefly to reinforce the views of the plaintiffs and remove the difficulties of the court on that point; but we are no less ready to review both points, under the advantage of the present argument, than if the same relative importance had been maintained between them as on the previous hearing.

We do not think that the plaintiffs have placed themselves in a position for questioning, in this action, the regularity of the proceedings in the custom house in initiating or conducting the appraisements complained of, because they did not make objections of that character a ground of their protests. They dealt with the appraisement as being one right in form and even in substance, provided the time of shipment was properly taken as the time of purchase, and they cannot now charge upon the collector any defective or unauthorized exercise of power, not designated in their protests as grounds of objection. Mason v. Kane [Case No. 9,241]. The same position was taken by this court, in the case of Thomson v. Maxwell [Id. 13,983]. In that case, and in others decided about the same time, this point was carefully considered, and it was held that the importer could not maintain an action against the collector, to recover back duties paid, without proving that the moneys remained in his hands when the action was brought, or that a protest in writing was made at the time of payment, "setting forth distinctly and specifically the grounds of objection to the payment thereof."

We find that our construction of the statute in this particular has been sustained by

the highest authority, in decisions published since our opinions were delivered. In Norcross v. Greely [Case No. 10,294], a commission of 2½ per cent. (with other charges) was added by the collector to the invoice value of an importation of crockery. The importers protested that they "pay no such commissions" as were added. The circuit court in Massachusetts decided that the plaintiffs were not entitled under the protest to recover back the payment. The objections taken at the bar were, that commissions were not usually paid in the trade of importing crockery-ware from England; that, if paid, there was no usual rate; and that 2½ per cent. was not an usual rate of commissions; but the court ruled that the plaintiffs could not avail themselves of those objections in the action, without setting them forth distinctly and specifically in the protest. Duties are not, in judgment of law, illegally exacted, so as to afford a right to the importer to recover them back, when the protest required by the act of 1845 [5 Stat. 750] is not made (Lawrence v. Caswell, 13 How. [54 U. S.] 488); and the act in terms fixes the requisites of the protest.

The counsel for the plaintiffs has gone through a labored research of the tariff acts from their earliest enactment, and has argued from them that congress has placed the whole system upon such a footing, that the oath made under the circumstances presented in this case, together with the sworn invoice, determined the purchase-price and dutiable value of the importation, and that, even if the acts could bear the construction that goods imported by the purchaser and owner could be subjected to an appraisement, yet an appraisement not ordered by the collector on his suspicion of an undervaluation in the invoice, and not conducted in all particulars by the appraisers pursuant to the direction of the acts of congress, was utterly void, and afforded no authority to the collector for increasing the duties.

We do not concur entirely with the counsel in the inferences he has drawn from the statutes he has examined, but we forbear from all discussion of the subject, for the reasons before indicated. These particulars of objection should have been pointed out to the collector in the protests, so that, if any error existed, he might have protected himself or the government from the consequences, by having it rectified, or have relieved the plaintiffs without litigation. They cannot, under a proper understanding and enforcement of the act of 1845, reserve such objections until the trial of their suit against the collector, and then make them available to charge him and the government with the repayment of the duties collected. In our opinion, this branch of the case also falls within the provisions of the act of 1845; and, as the protests did not set forth, distinctly and specifically, these objections to the payment of duties, they cannot now be regarded.

The particular point upon which we understood that a review of our former decision was sought was, whether the plaintiffs were entitled to enter the iron at the prices it bore when the contracts of purchase were closed, or whether it was liable to duties on its value at the times of its shipment. We listened to the application for a rehearing, under the impression that the point might involve the construction of the tariff acts in a particular which does not seem to have yet been made the subject of judicial exposition; and, although satisfied with the construction we first gave to the law in this respect, we were anxious to see if any reasons, satisfactory to us, could be shown against our conclusions, in order that, if erroneous, they might be corrected before they should be promulgated.

For the purposes of this decision, it is assumed that the proofs show that the iron imported conforms entirely to the articles stipulated, in the correspondence between the vendors and the plaintiffs, to be furnished under the orders given, and also that the usage of that trade regards the orders given by the plaintiffs, and their acceptance on being booked by the manufacturers, as a completed contract of purchase and sale. Under the equity of such a contract, if not by its legal effect, the iron, when manufactured, may be regarded as the property of the plaintiffs. We state these propositions in the strongest form in favor of the plaintiffs, in order that the point arising out of them, and in contest in this action, may be fully met and covered by our decision.

Assuming that the invoices were made up as of the times the iron was contracted for, and that they set forth correctly the prices agreed to be paid for the iron. we do not think that the contract between the parties constituted the purchase contemplated and provided for by the revenue acts, so as to fix the dutiable value of the goods or even justify their entry by those prices. It is to be observed that the tariff and revenue laws, in all their enactments of duties specific or ad valorem, have relation to the res, to property itself, and not to legal or equitable rights of property. Iron in bars or hoops is subjected to a duty of 30 per cent. ad valorem, and that tax fastens upon the commodity, not from the time it is manufactured for a particular purchaser, but from the time it is acquired by him for the purpose of importation. This was the effect of the law prior to the act of March 3, 1851 (9 Stat. 629). Greely v. Thompson, 10 How. [51 U. S.] 225.

The 16th section of the act of August 30, 1842 (5 Stat. 563), declares that "it shall be the duty of the collector," when ad valorem duties are imposed "on any goods, wares or merchandize imported into the United States," "to cause the actual market value or wholesale price thereof, at the time when purchased, in the principal markets of the country from which the same shall have

been imported," to be ascertained, &c. This language points significantly to things in being, to commodities having a market value and price in the principal markets of a country, and is in no way adapted to express the idea that a prospective contract of purchase with a manufacturer who is afterwards to make the article, shall fix the value or price at an indefinite period subsequently. when the purchaser may obtain the merchandise. The 35th section of the act of March 2, 1799 (1 Stat. 654), in describing the invoices required and the oaths to be taken by importers, manifestly applies both to the merchandise in the condition in which it is imported. And the act of March 1, 1823 (3 Stat. 729), so strongly relied upon by the plaintiffs' counsel on the argument, has relation, in its enacting sections and in the form of the oath prescribed to the owner, consignee or manufacturer, to the property imported, in the state and condition in which it was exported from its place of production, and most plainly contemplates the ordinary dealing between buyer and seller in market. The 4th section of that act (Id. 731) enacts that, where goods imported shall be entered by invoice, the owner shall make oath that the entry contains a just and true account of all the goods, and that the invoice contains a just and faithful account of the actual cost of the said goods. The terms employed in the same section, in the manufacturer's oath (Id. 732) that "the goods were not actually bought" "in the ordinary mode of bargain and sale," supplies an interpretation of the sense in which congress used the phrase actual cost, in the owner's oath, and plainly indicates the meaning to be that the goods, then owned by others, were acquired at the prices stated in the invoice. So, in connection with the manufacturer's oath, the requirements of the 5th section of the same act (Id. 732) tend to confirm this construction; because, the word "procured," there used, imports an actual possession of the property, and, "actual purchase" being so placed in juxtaposition with "procurement," the same legal signification must be given to either expression in respect to possession of the goods.

That this consideration is entitled to weight, in determining the intention of congress in the whole provision, may be strongly illustrated by supposing that the Coalbrookdale Company had, at the time they received the orders of the plaintiffs, resolved to ship the iron called for on their own account, and registered the rates on their books and directed the quantities to be shipped by their works. It is obvious they could not have invoiced the iron at those rates and prices, but must have charged the market price at the time the iron was produced by them, that is, when it came to their ownership manufactured, in a state for exportation. Upon the same principle, we think that the plaintiffs cannot be regarded as having been actual purchasers of the iron, within the meaning of the revenue laws. until they became owners of the thing itself—the subject-matter made liable to duties. Whatever in law would constitute a delivery and legal ownership might satisfy the purpose of the revenue acts in respect to possession; but, manifestly, the property must be in a state and condition that it may pass by delivery to the purchaser.

Chancellor Kent (2 Comm. 468, and notes) states accurately the constituents of a valid contract of sale. The thing sold must have an actual or potential existence, and be specific or identified. and capable of delivery; otherwise, it is not strictly a contract of sale, but a special or executory agreement. Admitting the arrangement between the plaintiffs and the Coalbrookdale Company to have had all the essential properties of a contract of sale, it by no means follows that, as such, it became an actual purchase of the goods and merchandize. within the meaning and policy of the tariff acts. Indeed, without laying emphasis upon the obvious design of congress that the property imported should in kind be the subject of sale and delivery, to constitute a purchase, it may well be doubted. upon the authorities. whether the contract set up by the plaintiffs could carry with it any title or right in the plaintiffs to the iron after it was manufactured. Chit. Cont. (Ed. 1851) 336; Add. Cont. 45, 46; Smith, Merc. Law, 292–294. The sale was not in praesenti, and every thing, even the creation of the goods by the vendor, was to be done before delivery. Upon these qualities of the contract, it would be difficult for the plaintiffs to maintain an existing property in them to the iron, coeval with the making of the contract. It is to that date they refer their purchase or acquisition of it.

Suppose the value of iron had depreciated largely between the date of this contract and the time of the shipment—could the collector have directed a valuation of the iron as of the time of the order? And, in a stronger point of view, could the plaintiffs have been assessed or taxed on the amount of the purchase-price of the iron. as for so much property actually purchased by them? In our opinion, the term "actual purchase," used in the revenue laws, is stronger. in its ordinary import and legal signification, than the phrase "contract of sale," and necessarily implies the acquisition of the thing as actual property. We think, therefore, that on the fair construction of the statute, the plaintiffs are not permitted to claim the date of their contract as the time of the actual purchase of the iron.

We have given this part of the case an enlarged consideration. more to satisfy the counsel that no part of his elaborate and well-reasoned argument on this point has

been disregarded by the court, than to obviate any real difficulty presented in supporting the judgment before rendered by the court. For, conceding that the plaintiff's were actual owners of the iron at the time alleged by them, and that its price then coincided exactly with their invoices, we think they cannot support this action, either for an overvaluation of the goods at the custom house and the imposition of duties upon that valuation, or because of any irregularity or want of authority on the part of the appraisers or other officers of the custom house, in appraising the iron or raising its invoice and entry valuation. To lay a foundation for the action, they must show that the duties were illegally exacted by the collector, and that they are entitled to appeal to the judicial tribunals for relief. Lawrence v. Caswell, 13 How. [54 U. S.] 488.

Laying out of view the form of the protests, and considering the plaintiffs as entitled to prove their allegation that the iron ought not to pay duties on the valuation put upon it at the custom house, and that they were entitled to enter it at the purchase-price, the invoices are, as against the plaintiffs, prima facie evidence of the times of purchase, and become conclusive evidence on that point, unless a mistake of date therein is pointed out and proved by them. Marriott v. Brune, 9 How. [50 U. S.] 619. These invoices all bear dates concurrently with the shipments of the iron—March and April, 1849—and the plaintiffs show that the price of iron at Liverpool was then from 2s. 6d. to £1 7s. 6d. sterling, or more, higher per ton than the prices charged upon the invoices; and it was conceded on the argument, that the valuation upon which duties were imposed corresponded with the correct market value of the iron when shipped. There is no proof in the case, that any notice in fact was given to the collector that the invoices were incorrect in dates, and, under that state of facts, we think that the plaintiffs were legally concluded by their entries and oaths and by the invoices, from claiming a valuation of the invoices at periods anterior to those dates.

It is thus manifest that this action could not be supported, even if the form of the protests was not interposed as an objection by the defendant. We are, however, not at liberty, in deciding the case, to disregard that objection, and are of opinion that the protests made to the collector do not authorize the plaintiffs to take any exceptions to the authority of the appraisers to act in the valuation of the iron, nor to prove it was purchased at the times their orders for it were received and accepted by the Coalbrookdale Company, or at any time antecedent to the dates of their invoices. Judgment must accordingly be entered for the defendant.